We'll turn to Whelan and Grillo v. SEIU Mr. Jennings May it please the Court, my name is Jeffrey Jennings. I represent the two appellants in this case, Kiernan Whelan and James Grillo. The district court below should be reversed for two reasons. First, it ignored this Court's decision in Penske v. Duncan that when courts are looking to see if an exception to Section 1983 liability exists, it should look to the common law to see if there's an analogous tort. And second, to the extent that the district court did look to the common law, it was wrong to say that abusive process is an analogous tort to a First Amendment claim. First, the district court ignored Penske v. Duncan. There this Court was considering a due process violation under Section 1983 for damages. The Court, this Court was very clear in Penske that it was looking to the common law to see if there was analogy that should be adopted. In that case, the Court found that malicious prosecution was analogous to a due process violation. Thus, it was appropriate to adopt the elements of malice and lack of probable cause. So that case makes clear that you have to look to the common law. And second, that we're not talking about some type of across-the-board affirmative good faith defense. Rather, what we're talking about are the elements of the claim that the plaintiff has to prove. Penske also shows that there has to be a tightness of fit between the constitutional violation alleged, there it was due process, and then also the common law tort analogy that's being adopted, there it was malicious prosecution. Two Supreme Court cases also emphasize that point in the context of qualified immunity. In the Owen v. City of Independence case, there the Supreme Court said that there was no history of cities enjoying any type of good faith immunity at common law, and therefore cities should be exposed to liability. That was true even though there was some exceptions to that where cities at common law, if they were acting in a governmental capacity, did enjoy certain types of immunity. But the court said that that wasn't enough for there to be an across-the-board immunity. Likewise, in Tower v. Glover, the Supreme Court also said that public defenders are exposed to liability. There's no good faith immunity at common law. That was true even though defense counsel at common law enjoyed a privilege if they said defamatory things in the course of judicial proceedings. The court was clear that that didn't fit the situation before there in Tower v. Glover of a public defender and a prosecutor conspiring together to secure somebody's conviction. Here, of course, the conduct that's alleged to be violative was conduct that relied on a statute and, frankly, on a Supreme Court case, Abood, that found the statute constitutional, correct? Yes, Your Honor. Is there any common law authority that says that a party can't rely in good faith on a statute that has been explicitly found to be constitutional by the Supreme Court of the United States? No, Your Honor, but I think the Supreme Court cases make clear that when you're looking to the common law, there has to be a tightness of fit between the common law analogy and the constitutional violation. I understand that, but you answered my question, no. You started your answer by saying no. So there's no common law authority that says that it's you can't rely on a statute that the Supreme Court itself has found explicitly to be constitutional. Well, Your Honor, my understanding at common law, there's no instances where private parties have some type of affirmative good faith defense to every type of tort. When the Court's looking at these types of examples, for example, with due process, they found an analogy to malicious prosecution. In those situations, if a private party was sued for damages for misusing a court process, they had to prove the elements of malice and lack of probable cause, which are two prongs that go to the state of mind. And as the Supreme Court's footnotes in Wyatt v. Cole make clear, when we're talking about a good faith defense, we're not talking about an affirmative defense like statute limitations. I understand. Rather, what we're talking about are the elements that a plaintiff has to prove or a good faith defense in the sense that the defendant's rebutting the elements of malice and lack of probable cause. And that brings me to my next point. Abusive process has nothing to do with the First Amendment. The district court below relied on that as being a reason why they could say there's a good faith defense. But abusive process is limited to court processes. It's not beyond that at common law. It wouldn't expand to other types of processes, like in this case, a collective bargaining agreement where the state and union were conspiring to force people to speak on behalf of political causes with which they disagreed. And that really shows the rub of it. I mean, this is a First Amendment claim. It's about free speech. It has nothing to do with misusing a court process. And because of that, because there's no fit, this case falls within Owen v. City of Independence, where there the city was exposed to liability. And here, too, the union is exposed to liability because there's nothing at common law that would be appropriate to adopt as a common law analogy. And I'll just conclude. We say at common law, you were expected to adhere to a statute that had been ruled constitutional by the highest court. That doesn't seem to be a controversial proposition. So everybody was, that was the rule of law. You were expected to adhere to it. That was the common law. Is that a fair characterization? Your Honor, I mean, I think it's always been true that courts are bound by what the Supreme Court said. There is a Berzall case where it generally talks about how there's authority that it's okay, it's reasonable to rely on the law at the time. But that kind of shows just that what we're talking about here is that a common law, to the extent that, like with malicious prosecution, it had two prongs. There was a subjective prong, and then also an objective prong of showing lack of probable cause. So even if it was reasonable to rely on the law, the plaintiff could then still look at the subjective element to see if somebody knew that the law was about to be overturned or that it was unsettled. And so for those reasons, we still think that bad answer is this case. And I'll just conclude there and save the rest of my time for rebuttal. May it please the court, I'm Scott Cronland for the union. The union was following state law and Supreme Court precedent when it received fair share fees to pay for collective bargaining. The district court was therefore correct to dismiss the section 1983 damages claim against the union. In Lugar, when the Supreme Court first interpreted section 1983 to mean that a private party that relied on a statutorily authorized process to obtain the assistance of the government could be considered a state actor. The Supreme Court also recognized that that could lead to an injustice. And the Supreme Court suggested that that problem, which is what the court called it, should be addressed by establishing a defense. And since Lugar and the Supreme Court's subsequent- Breyer, you're asking us to embrace as a broad good faith defense across the board. But across the board in the sense that whenever a private party is being- And that poses its own problems, it seems to me. We're not asking across the board for every 1983 case. We're suggesting that when a private party is sued under Lugar, because it relied on a statutorily authorized process to get the government's assistance, the species of common law tort that is most analogous are the same species of tort that applied in Wyatt and Pinsky. They're the malicious prosecution, abusive process species. The Pinsky requires us to undertake the approach that Pinsky itself undertook, or is it just the acknowledgment that a good faith defense may exist in a particular case, in a 1983 case? We don't think the court has to do that. The principles of equality and fairness that are referred to in Wyatt apply without regard to a specific common law analogy. But if the court does look for a specific common law analogy, the most analogous torts would be the abusive process, malicious prosecution species of tort. And plaintiffs have not suggested- But all of those are, as your friend suggested when he was up, those deal with the judicial process itself, right? They do, your honor, but there isn't a more analogous species. That's the species that deals with using a statutorily authorized process, which is what we did here. Well, I understand. There may not be readily at hand a species which is helpful to your argument. But I would think if indeed there is no species of common law remedy to deploy, maybe that cuts against your argument. Well, the Supreme Court has never found a situation which an analogy was not possible. They've said that the common law is meant to serve as a source of inspiration, not of prefabricated components. Justice Scalia and Anderson v. Crichton, he dealt with a situation in which a police officer would not have had a defense at common law for searching a house to look for a third-party fugitive. Nonetheless, he found that qualified immunity applied because the court was looking to the common law tradition, not to specific examples, and applying qualified immunity across the board. Now we're moving to the common law tradition, as opposed to analogous claims or causes of action. Well, we're looking to the common law tradition, but the common law tradition in terms of whether private parties who relied on a statutorily authorized process would have been liable, and there isn't a common law tradition. What is the narrowest path to get to where you want to be? That is, is there a way to avoid the Pinsky approach, that is to advert to the common law tradition or common law analogies or analogous common law torts and so on? Yes. The Court could hold, as the Seventh Circuit did as part of its ruling in Janus, that when a private party is relying not just on State law, but on directly on point U.S. Supreme Court precedent, principles of equality and fairness referred to in Wyatt justify a good faith defense to damage its liability under Section 1983. As the Seventh Circuit pointed out, this is going to be a relatively rare situation in which there's a U.S. Supreme Court case directly on point, and what you have is good faith as a matter of law. Let me ask you about the state of play in Connecticut under this body of law. What is happening today with respect to the application of the Supreme Court law on this question? It's not directly relevant, perhaps, to this argument, but... The moment the Supreme Court case came down in Janus, the State and the Union stopped collecting any fair share fees. This is in the record. It's why the District Court dismissed the case as moot. In fact, payroll was already in progress at that time. The State couldn't stop sending the check for fair share fees, which was actually for work performed before Janus. The Union refused to accept the money. They sent it back to everyone. They respected immediately the rule of law, even if the Union may not have agreed with the 5-4 decision in Janus, and the rule of law should go both ways. Before the Janus decision, Abood was the law. The Union was following what the Supreme Court said was the law, and it would undermine respect for the rule of law, for stare decisis, for what the Supreme Court has said that the courts are supposed to do, which is follow the directly on point Supreme Court precedent. In the good faith analysis, there's a subjective component. Is that right? Yes, there is a subjective component, but in this case, we couldn't have known that the collection of fair share fees was unconstitutional because it was constitutional at the time, as many of the lower courts have pointed out. And that's why we refer to this as a case of good faith as a matter of law. If you're following not just state law. That's what I'm getting at, good faith as a matter of law. But that's a little hard if you've got a subjective component to it. It's a little hard to unpack that issue. Well, as some of the lower courts have pointed out, no amount of discovery could show that we knew something that wasn't true. At the time, it was legal, so we couldn't have known otherwise. What, in your view, maybe you can help us understand this emerging body of law. How have the other circuits decided this case? Do we have a clear idea on that? Well, so far, the Seventh Circuit is the only circuit to decide exactly this case, and they've ruled in favor of the union. We have about 20 district court decisions, all of which were in favor of the union. After the Harris v. Quinn decision, there were several district court cases, all of which applied the good faith defense to rule in favor of the union. One of which was the one that this court affirmed by summary order in Jarvis v. Cuomo. That's very similar. Jarvis was exactly this case. Thank you very much. Unless the court has questions, I'll cede my time to the state. May it please the court. Solicitor General Claire Kindle for the state defendants. The state has a very strong interest in there being a good faith defense for private actors who are relying on presumptively valid state law, in which the Supreme Court for 41 years held was a valid state law. And- On both of those things, that's what I'm interested in. Because I think that it's a little problematic to just rely on, potentially to rely on the first part, which is just a valid state law. Here, we don't necessarily have to deal with that because it's two components. Valid state law plus the stamp of approval from the Supreme Court. Correct, Your Honor. In this particular case, we have both. And I would direct the court to the Pinsky decision at 313, where it states that it is common law authority that it was objectively reasonable to act on a statute that had not been held invalid. I would say in these very unusual and unique circumstances of this case, where not only did we have a state law that was held to be, not held to not be invalid to all our double negatives. But we actually have a boot that says it was valid. And the doctrine of stare decisis, I think, would make it as a matter of law, presumptively valid. And that the subjective, this discussion of subjective elements, I think, is incredibly dangerous to the rule of law. How the Supreme Court is going to rule is not something for a horse race or betting. When the Supreme Court rules, it rules. And until it rules, what it has said is a law, and we want people to rely on that. We don't want private individuals saying, well, maybe they will or maybe they won't. That's not what the law is about. And the state has a very strong interest in the rule of law. Water view that there's a good faith defense that cuts across any section 1983 action for private actors. I'm going to go out on a limb and say, any time that the Supreme Court has blessed a law, said it's valid, and then does a 180, 40 years later, I think that I don't care what the underlying claim is, that that should be valid, that that should be, as a matter of law, good faith on the basis of Starford. So if you cut out the Supreme Court component of it, as I understand it, one argument is that a good faith defense is available in any section 1983 action to private plaintiffs. And maybe I could add the little codicil that it's a private plaintiff that relies on a valid statute without the Supreme Court stamp of approval. Do you agree with that view? Your Honor, I would say that I would think in Jarvis this court, although it was in summary order, took the right approach. That rather than being bound by the Penske, let's find an analogous common law tort. They simply said that affirmative defenses did not need to rely on or rebut specific elements of the underlying claim. And I think that is probably, I would respectfully submit, that is a better way for this court to approach this problem. On course. Correct. If there's no further questions. Thank you. Thank you. Appreciate it. Okay, Mr. Jarvis. Thank you. I first would just like to start off by pointing out the state in its brief makes a lot of policy arguments, but that's exactly what the Supreme Court said in Tower versus Glover that courts are not allowed to rely on solely. Their public defenders were exposed to liability because there was no common law history of them enjoying some type of across the board good faith immunity. And then the public defenders said, well, we really need this because it was the Supreme Court said that, well, that's a good policy argument for Congress, but it's not for us to affect. Mr. Jennings, Mr. Conlon, in response to my question, indicated that this issue, which, of course, is of unquestionable importance and arising in many jurisdictions, that the state of the law is that only the Seventh Circuit has ruled directly on this question. And there have been some 20 district court decisions all in favor of the union. Is that more or less your understanding of the situation? Yes, Your Honor. And we've got a summary order that also is in favor of the union on essentially the same procedural and factual grounds. Yes, Your Honor, the Jarvis decision is unpublished, so it of course doesn't bind in this panel, and it's not persuasive because it departs from what this court did in Penske, which was looking to the common law to see if there was analogous tort. The Jarvis opinion was very brief, and it talked about it in terms of an affirmative defense, but that's not how this court described the proper analysis as in Penske. It's also different from what the Wyatt versus Cole Supreme Court was talking about. The footnotes of both the majority and dissent described it in terms of elements not affirmative defense in the way that, like a statute of limitations would be applied. So for those reasons, Jarvis shouldn't be followed by this panel. And as I've talked about earlier, there's really no analogous tort to a First Amendment claim, and because of that, the union should be exposed to liability. Now Penske long anti-dates the relevant decision that brings us here today, which was 2018, so how does that help you? Penske was in 1996 before our court. And you're invoking that in a sense in opposition to Janus, is that right? Your Honor, I would submit that Penske binds this panel and that Jarvis, because it's unpublished, does not. Moreover, Jarvis should not be followed because it departed from what this court did in Penske, which is binding authority, and it also departs from what the Supreme Court was talking about in Wyatt v. Cole, which is really the only guidance the Supreme Court has given on this issue in terms of a good faith defense. And the fact that there's no common law analogy shows that the union is exposed to liability. The Supreme Court was clear in Rayburg v. Polk that Section 1983 is so much more than just codifying the common law. It was meant to give people a cause of action and a remedy when their constitutional rights were violated. And of course, there's not always going to be a common law analogy to that. And just like in Owen v. City of Independence, Tower v. Glover, when the court finds no history or good fit between the common law and the violation, the answer has to be that the defendant has no good faith defense. And I see that my time's up. Thanks very much. Thank you. Thanks to counsel. We appreciate your arguments, and we'll turn to Hurley versus Sandals Resorts. Okay, Mr. Moses, you're on. Thank you, Your Honor. Good morning. My name's Bryce Moses, and I represent the appellant in this case, Scott Hurley, who in June of 2016, while at a Sandals Resort in St. Lucia, there to attend his daughter's wedding, stood beneath a tree when a limb fell, crushing his leg and foot. That limb came from a diseased and rotting tree. There was no warning. There was no notice. Seven surgeries later, we're here, before this court, because Sandals is claiming they don't do business in Connecticut. Sandals advertises in Connecticut on their airways, TV. They publish ads in magazines and newspapers, all delivered to my client's home. They have dedicated, specialized agents who are trained by Sandals to obtain the title of a specialized Sandals agent. They are given promotional materials by Sandals, even a car wrap, so they can drive around Connecticut promoting Sandals' interests. Yet, we're here because the district court found and required an element that simply is not required. The district court found that minimum contacts were insufficient to hail Sandals into Connecticut because the minimum contacts in Connecticut did not cause this injury. That is an element that is simply not required by the Supreme Court. All that we need to show is that Sandals' contacts with the forum state were related to the basis of the lawsuit. How can one say that a company such as Sandals, who has dedicated sales representatives on the ground in Connecticut, in Stamford and Greenwich, who openly solicit Connecticut residents to come visit their resorts all over the world. How can we not say that that conduct is related to what gave rise here? So your client booked through JetBlue. Correct. And he was not actually staying at the Sandals resort where he was injured. He was staying at a Sandals resort. At a Sandals, but not this one. Yes, that's correct, Your Honor. He was staying at a different Sandals resort in St. Lucia.  doesn't end the analysis. The advertising and the contacts that were being put forward by Sandals in Connecticut were all related to those properties in St. Lucia. How can Sandals say they didn't expect to be brought into a Connecticut court to defend a lawsuit brought by a Connecticut resident when they were spending these efforts to solicit these residents to visit their resorts all over the world, including St. Lucia? You're suggesting for a second time in your argument that Connecticut would have jurisdiction over any case of this sort anywhere in the world because Sandals is active advertising for resorts all over the world. No, I'm not, Your Honor. What I am specifically saying is Connecticut would have jurisdiction for actions brought by Connecticut residents, which is an important distinction to be made because the defendants rely upon the Supreme Court decision in Bristol-Myers, but that dealt with non-residents. Scott Hurley, he is a resident of Connecticut. So what I am proposing, Your Honor, is that Connecticut would have jurisdiction for lawsuits brought by Connecticut residents against St. Lucia for torts that under the specific personal jurisdiction, under specific jurisdiction. Yes, Your Honor. And the second prong of that analysis, Your Honor, to allow your concerns about opening up a floodgate of litigation is the conduct that gives rise to the action needs to be related to what the advertising is and what the contact is. Here they're advertising the resorts. The lawsuit here arises out of the negligence in properly maintaining that resort. It's not the case that Your Honor has decided involving DiLorenzo, involving somebody that had no connection to the contacts. This is a situation in which the very advertising has to do with the resort. If Mr. Hurley, he was at a tiki bar three miles from the resort and slipped and fell, we wouldn't be here. This actually happened on the resort. This is a result of their failure to maintain the resort, the very same resort they're advertising on the Internet through their specialized travel agents. And for Sandals to say it's fundamentally unfair for them to be brought into Connecticut court, because they simply didn't anticipate being brought into Connecticut, kind of belies common sense when their entire corporate structure is designed to avoid liability in Connecticut. They have agents upon agents upon agents, and they sit there and they maintain we simply didn't know. So what if the wedding venue was at a non-Sandals resort? Still have jurisdiction? No. Okay, so it's just because the daughter chose to have her wedding at Sandals that he has a cause of action against Sandals? No, Your Honor. It's because Sandals chose to advertise in Connecticut to Connecticut residents, and a Connecticut resident was on Sandals property. It doesn't have to be specifically to the plaintiff. In fact, this court has disregarded that analysis. It's not based on the contacts with the plaintiff. It's based on the contacts with the forum state. And here the contacts in Connecticut are substantial. The contacts in Connecticut are thorough and specifically designed to do what occurred here, solicit residents to our resort. Whether they came there directly. A little bit more of a causal relationship between the injury here and the contacts? No, Your Honor. You just. There doesn't need, there's not a but for analysis here. The Supreme Court language in Bristol-Myers Squibb specifically rejected the causal relationship analysis. Justice Sotomayor specifically stated in her dissent that the court chooses not to take this as far as a but for analysis. That was rejected. That's what Bristol-Myers tried to get the court to adopt. That was rejected. It needs to be related to, and here's why. Because the whole basis of this analysis is premised on fundamental fairness. And if it's not related to the contacts in the forum state, it's understandable that it would be unreasonable to bring a defendant into a state that they have no contact with. But when the contacts are related to the basis of the lawsuit, how can you say it's fundamentally unfair? How can you say it's unforeseeable? How can you say Sandals didn't know that the people that they solicit in Connecticut might bring them home to Connecticut to answer for their negligence? Thank you. May it please the court, Tom Scott on behalf of the defendants, Latak and SRI. Your Honor, Judge Myers, the judge in the lower court, wrote a very tight and astute order which correctly recites the law and the evidence in the case and reaches the correct conclusion. Judge Myers began by saying, okay, under a personal jurisdiction analysis, there's a long-arm statute requirement, there's a due process. He avoided the problem of analyzing the Connecticut statute. He went directly to the due process. He then went to the due process and said, under the due process consideration, I'm not going to consider the second element, reasonable inquiry. I'm going to consider the first element, minimum contacts, because that's the specific issue in this case. He considered the minimum contacts question. Under the minimum contacts question, the first issue was the general jurisdiction. At the time of oral argument, and the transcript is not in your record, but it's in the record below, but at the time of the oral argument, plaintiffs conceded there was no general jurisdiction. So it went specifically, then, to the issue of the specific, and that was what the case turned on. Now — That's where we are today. Pardon me? Where we are today. Exactly. So that's where we're at right now. So let's talk just briefly about the facts. There is evidence adduced by Sandals, which was uncontested, uncontroverted, in which LaTocq is a hotel, it does not solicit, it does not do anything. SRI is a management company. It does not solicit, it does not do anything. Neither of these companies, either LaTocq or SRI, have anything to do with the State of Connecticut. Neither maintains office here. They don't solicit business here. They don't have a target Connecticut here. They don't have any contacts here whatsoever. Was there not an agency? Pardon me? Was there not an agency argument that was made to try to tie them all together? Yeah. And I'm going to address that, Judge. Sandals has two corporations that handle the travel and promotions. One is UTC. It's worldwide. It's a Panamanian corporation. It's a standalone company. Sandals has nothing to do with UTC. UTC entered into a contract with UVI, an American corporation. And this is all in the record uncontroverted. UVI does the promotion and travel and things of that nature. UVI runs the website. UVI has contacts with the travel agents. UVI does everything in an American corporation in Connecticut. Not SRI, not LaTocq. There is no record evidence of that. Let me suggest the evidence of my television set as a Connecticut resident. I see an awful lot of ads for precisely this locale by Sandals Resorts. And that's not significant? Judge. That's not part of the record? But that's part of the record, absolutely. But my clients, the two companies that have been sued in this case, have no relationship with that. They have nothing to do with that. Those are separate corporations that do that, not Sandals. So. Alito. Was there a request for jurisdictional discovery on the agency issue? Yes, there was. And the judge under under. It was denied? Pardon me? It was denied? It was denied because of the fact that he did not find a prima facie case of a relationship of an agent of a relationship of an agency relationship. There were no specific facts. It was conclusory allegation, and that's what he found, and that's what it shows. And the record completely supports that. So he felt that under an abuse of discretion standard, there was no need for discovery here, because there was no evidence of accredited that would absolutely support the situation here. And it. If you're so certain about that, I suppose you would have no great concern about having a remand to Judge Meyer to permit a limited course of discovery on that question, right? Judge, I don't think it's required in this case. I honestly don't. I don't think it was required. I'm just suggesting that if such strong and vivid views on the matter, it appears that you have no concern in achieving your objective in the district court. Judge, I don't believe that under an abuse of discretion standard and under the requirements which they have to show, a prima facie case, specific, non-conclusory allegations, that that was established. And it would be wrong for the Court to find that he abused his discretion. In one of the cases that was cited by. Alito, what was the shortfall? That is, what was the problem with the allegation relating to or allegations relating to agency? There were no allegations. Actually, I don't, and counsel can correct me, I don't even think that the complaint contained an allegation of agency. That was something he raised. I could be wrong because there's a request in his reply brief that if they remand, he'd like to amend to include an agency. So there wasn't even an allegation of agency. It was of ownership. And we didn't, and they didn't own the company. It had nothing to do with the company. Alito, my answer to these questions is that you are focused on the lack of agency, correct? Yes. And yet there was a denial of a request for jurisdictional discovery on that issue. There was a request, and he denied it because he did not think there was a prima facie showing for that basis. But there's also another question, Judge, which you're going to have to consider on this agency issue, and that is, under specific jurisdiction, is agency even a plausible theory? You know, in Bamler, they suggested very strongly, they suggested very strongly in a general jurisdiction setting that that agency should not be considered. And in this Court, in the case of Scenera Holding, which is cited in our brief, said, the Second Circuit observed that Bamler, the Supreme Court, expressed doubts as to the usefulness of an agency analysis that focuses on a forum, States, affiliates, importance to the defendant, other than on whether the affiliate is so dominated. And I will tell the Court that there have been other decisions nationwide holding that as a matter of law in post-Bamler. There is no longer an agency relationship theory, an agency relationship theory that you could even plead. So there's a legal hurdle right there that they have to be able to establish that that agency theory is viable. We also cited other law in our – that said that a defendant's relationship with a third party standing alone is insufficient basis for jurisdiction. That's U.S. Bank. And that sparse allegations of agency, just like in this case, if there were any at all, are too conclusory to make out a prima facie case for showing of it. So – and then it said, to attempt an agency jurisdiction, plaintiffs must allege – this is another case by this Court – must allege the actual exercise of the control based upon the realities of the relationship. That was the Ho Yin case, which we cite in our brief. Here, there is no realities of relationship because there is no relationship. These are separate, stand-alone companies that have nothing to do with that. And this Court, in a case in 1988, Jan Zinzi, J-A-Z-I-N-I v. Nissan Motor Company Corporation, specifically held that where a corporation uses, in that case, subsidiaries – we don't even have that here, we have separate corporations – to insulate itself from liability, which is one of the concerns of one of the panel members, that there's nothing wrong with that, that that's the law and they're entitled to do it. Here, that's exactly what happened. So, from a factual standpoint, they have not established – they have not established any type of agency, let alone pleaded. From a – and from a legal standpoint, there is good law questioning whether even an agency relationship in a specific personal jurisdiction can lie. And I believe it cannot lie. So, for both factually and legal reasons, it's my position and my client's position that the Court should reject that particular contention. You know, Judge, UTC and UVI are not subs. They're separate companies. LaTocq is a management company – is a hotel owner. SRI is a management company. They have nothing to do with these ads. They cannot be hailed into this Court. And in viewing the issue of specific jurisdiction, you have to view the defendant's conduct and protect the defendant under due process standards. Here, this judge looked at the law. He looked at the Bristol-Myers and the Walden case, and he said there has to be a direct connection to the cause of action. He looked at two cases or three from your Court, Charles Schweb and Bank Holding v. BOA. They said the same thing. And he looked at a case this Court decided just a year ago, DiLorenzo, which is very factually similar. It's a sexual assault on Antigua. And they made the same allegation, website advertising. It was rejected by this Court and it was affirmed, and there was a request for discovery in that case, and it was denied. I might also point out, Judge Reese, that you've written two opinions in the last year on this issue in 2018, one is called Hedgeman and one is called Vinci. And in one of those cases, both you rejected the idea of this same issue and you rejected the concept of the agency and discovery. I think that was in the Vinci case, a 2018 decision. So in sum, UTC and UVI are separate. There is no evidence and there is no specific allegations of any type of an agency relationship. Agency should not even apply in personal jurisdiction. And the fact, as the Court concluded, that this tree fell on him in a distant, faraway island is the exact standard under which Bristol-Myers, your own cases, and the Lorenzo case found no specific personal jurisdiction and denied discovery. We ask the Court to do the same thing. Kennedy. Mr. Scott, just a clarification question. Sure, Judge. Are you connected to Fitzpatrick and Hunt or you are separate counsel? I am separate counsel from Miami, Florida, Southern District of Florida. I practiced down there 40 years. And because the Fitzpatrick lawyer got sick, I came in to pinch hit for the day. Just a clerical question. No. Mr. Snyder, are you admitted pro act vitae for this case? Yeah. Judge, I have — I'm an ex-Federal judge, so — and, you know, so I've been — In the Southern District of Florida. Southern District of Florida for seven years. I was U.S. attorney down there and I was on the Court for seven years before I left. So, I mean, I have been around the block and I have a great belief in, you know, trial court discretion, as you can probably tell from my argument. And I thought this judge wrote a good order and went right to the point. Thanks very much. Have a nice — thank you for the time. Mr. Moses. Mr. Moses, is it the case that the District Court, at oral argument, Hurley, he abandoned his claims against defendant Sandals Resorts International? That's correct. Yeah. What's the significance or non-significance of that? It's non-significant, Your Honor. The two remaining entities are the ones that bear responsibility for the happening of this accident. The three original entities that were named were found by — through investigation and through due diligence, we realized that one of them were simply a — for lack of a better word, a company offshore located in Jamaica that is a bit of a shell corporation. We don't believe they have any affiliation with this particular resort. The two resort entities that were named have direct connections to this resort. I, with the Court's indulgence, want to just address a few of the issues that counsel brought up. First and foremost, the DiLorenzo case that they cite, this Court did not in any way find that specific jurisdiction failed to be met due to lack of minimum contacts under due process. That case was specifically found that the New York long-arm statute did not apply. It was not based on due process. Taking a look at Unique Vacations and their relationship with Sandals, I indulge the Court the next time, perhaps, Your Honor, you see a Connecticut TV ad, jump on the website, because if you take a look at the website, this corporation that has no affiliation with Sandals use words such as, we are the worldwide representative of Sandals International, our chairman, our CEO, and our family of resorts. This is not an independent, separate company under an agency theory. We would like a shot at — Your colleague says that the district court judge determined that there was not even a prima facie case, so you weren't entitled to jurisdictional discovery on that. I would disagree with that finding, Your Honor. We do believe it was an abuse of the lower court's discretion and to not to allow us, based on the record from pages 312 to 325, where we submit outtakes from the website, representations made on the website about the CEO, about the relationship between these resorts. We believe that an opportunity to conduct jurisdictional discovery would at least give us an opportunity to demonstrate to the lower court the exercise and control that Sandals had over these companies. It's hard — yes? So, the district court judge says that Hurley — Hurley, he does not allege that he dealt with any of these Connecticut-related agents or that there is any connection between these agents in his lawsuit. And Hurley — Hurley, he does not suggest that Sandals, LaTarka, Domiciled, and so on, on and on and on. But then there's also — I'm trying to find a line — that your client did not allege anything about agency. Well, our client did allege that the tickets were purchased through JetBlue that offered Sandals packages to my client at specific Sandals resorts, including the Sandals resort where the accident happened. We asked for — Where is the allegation about — the relevant allegation about agency? The specific word, Your Honor, with regard to agency or the theory of liability? Point me to somewhere in the complaint that talks about the agency between the defendants and Sandals here. I don't believe in the complaint there was an allegation of agency between — Isn't that the problem? Well, Your Honor, I believe that the allegations that were brought out in our opposition through testimony that Sandals, through their agency, induced Connecticut residents to travel to St. Lucia was certainly enough to at least provide us with the opportunity to conduct discovery on the issue. So what's the decree that you asked this Court to issue? Your Honor, it is our position that the lower court erred in not finding sufficient minimum contacts. We believe the lower court added an element that the Supreme Court never required, simply being — You only want — at this point, you would be satisfied with the opportunity for jurisdictional discovery. We'd be thrilled with that opportunity, Your Honor. We'd be even more thrilled if the court would find sufficient jurisdiction so we could proceed with discovery on this case. But to summarily dismiss our opportunity to at least investigate the agency relationship between these two companies and Sandals, we believe is an abuse of discretion. Thanks very much. Thank you, Your Honor. We'll reserve the decision. Appreciate your arguments, both. Thank you, Judge. We'll hear USA v. Mohamed Mahmoud Al-Farrakh. May it please the Court, I am Lawrence Mark Stern, and with me is Robert Boyle. We are here representing the appellant Mohamed Al-Farrakh. And the record will reflect that before coming into open court this morning, we had the opportunity to have an ex parte hearing in the roving room. And as part of that hearing, Mr. Stern and his colleague gave us the benefit of their views, all of this material being under seal until further order of the court. Go ahead. With time permitting, Your Honors, and with your permission, I would like to address two core issues in the case, one of which is the clearly erroneous failure of the district court to consider the whole record on the issue of suggestive identification and its omission of salient facts that were reduced in that record of suggestive identification and, indeed, his consideration, according to his opinion, of matters outside the record which were not introduced during the Wade hearing, and two, the failure of the court to apply to its preclusion of defense cross-examination of the fingerprint expert, its own rule which it invoked in favor of the prosecution, that when the jury would struggle enormously with its biases and preconceptions on a matter, it should be allowed to hear about other cases that address that bias and that preconception. The first of these issues is the one which, as I understand it, the court will address in a closed session, so I will address the second one first and then we'll take the break as I understand the procedure. That first issue is about whether or not the court balanced its rule, its own rule that it created in this case, and I'm using its words, when the jury would struggle enormously, quote, unquote, with its preconceptions about whether or not a clean-cut kid could become a terrorist, an issue which, as I understand it, wasn't even raised in the case, then the government would be allowed to bring in an expert to testify about other cases, to tell the jury that, in fact, essentially a clean-cut kid could become a terrorist, and hence permitted the testimony of an expert named Vidino to testify that he'd interviewed 30 people, 30 other terrorists, and he concluded that anybody essentially could be a terrorist. But when it came to the fingerprint request during the examination of the fingerprint expert for the prosecution, that the defense wanted to question the expert about the now-famous Mayfield incident and the report by the FBI, which involved the FBI's conclusion for many, many months that two people, two different people had the same fingerprint, when the defense asked to bring that report to the attention of the jury through cross-examination of the fingerprint expert, given the bias and the preconceptions that juries have that fingerprint evidence is infallible, that it's a science, that there's absolute certainty about it, notwithstanding that preconception and that bias, and the fact that the jury would struggle enormously to overcome that, the court precluded admission of the Mayfield report or cross-examination of the fingerprint witness about the Mayfield report. Both situations, the Vidino testimony about his interviews with 30 terrorists and the Mayfield report deal with another case and other cases, and this was the reason the court said it was precluding examination using the Mayfield report, that it's another case. It's going to distract the jury with other cases. Well, with the Vidino, he didn't say, I interviewed this person and I found X, Y, and Z, and then I talked to this other person and these were her characteristics. He didn't go into, he just said there is no stereotype of who becomes a terrorist, it can be anybody, and what you wanted to do is not just introduce that there could be a mistake with fingerprints, which you got in on cross, but in that particular case, using different agents, they had made a mistake, and it would have required some background into those individual characteristics of what happened in that case. So are those different situations, or how would you harmonize just a general opinion, no stereotype of a terrorist, as opposed to going into the specifics of a case and talking about what happened there, what was wrong there? I think, Your Honor, that what was supposedly a no-profile testimony about the Vidino became a profile testimony, in that now the court's question, could a clean-cut kid, as apparently Mr. Alferec looked like to the jury, become a terrorist? The answer is, according to our profiles, a clean-cut kid can be a terrorist. So indeed, these other cases informed this profile, which was presented to the jury, don't worry about that, this defendant could be a terrorist. As much of the other evidence in the case was about could-bes, could be this, could be that, could be his hair, could be his handwriting, no definite opinions, but a lot of could-bes. Here, with the Mayfield report, which the FBI itself in the report said is a watershed case, the first time that two people, Mayfield and the actual bomber in the Madrid bombing case, shared at least ten points of characteristics. At least the experts thought so, for many, many months, until finally the FBI withdrew the Mayfield identification, but for many, many months, contrary to everything that the juries have heard since their childhoods, my childhood, I think the court's as well, fingerprints don't lie. Well, here were two people with the same fingerprints, according to the FBI and according to the Spanish authorities. In fact, your honors, the FBI met with the Spanish authorities and were not convinced at first that their conclusion was wrong. It was important, absolutely important for the jury to know this, if there was going to be any substance to a cross-examination of a fingerprint expert. In fact, the perceptions are so strong that this court, in the case of Farhane, said that it was plausible for a prosecutor to use a Batson challenge against a juror who watched a lot of television, forensic science detective shows, it was okay to excuse that juror because he was going to expect infallibility, infallible scientific testimony in the case. The American Association for the Advancement of Science has repeatedly said that the public perception has been shaped by decades of overstatement by fingerprint experts. Most people think fingerprints are infallible. The FBI itself said that fingerprints are the gold standard of forensic science. Absolute certainty. Now, what about the significance of that? The government cites the case of United States against Mitchell, pardon me, in the Seventh Circuit, a case in which there was a full-blown investigation of the attempt by the defense in that case to make a Daubert finding that fingerprints were not science and shouldn't be admitted as such. The conclusion in the case was, well, most factors don't disfavor the admission of fingerprints. However, in that case, which was handed down before the Mayfield report, there were no false positives. The court held nobody's ever heard of a false positive in fingerprints. That was the basis of the decision in Mitchell. Are you aware of a district court that in the context of a trial, or even in the context of a trial proceeding, has permitted the defense to either refer to or try to disqualify the defendant? How does that deal with the Mayfield report? There are two circuit opinions, one in the Seventh Circuit, both in the Seventh Circuit, actually, which have upheld the preclusion of the Mayfield report. But in one of them called Rivas, defense counsel was allowed to address all of the mistakes and the problems that the Mayfield report brought up, but the preclusion was about the Mayfield report itself. There's another one in the Seventh Circuit called Bonds from 2019, actually. But they haven't had, that court didn't have the advantage of the American Association for the Advancement of Human Rights in Mayfield, concluding, finally, fingerprints are not science. Plain and simple. That there's no scientific basis for concluding that two people can't have the same fingerprints. Thanks very much, Mr. Smith. So in this, what was the significance? I did thank you as a way of wrapping up your oral argument. No, it's fine, it's fine. So this is the time to take the break, then? Well, we'll hear to opposing counsel, and then we'll hear your motion for a meeting in camera. Can I have some rebuttal to them on this issue? Yes, sure. May it please the court. My name is Richard Tucker. I'm an assistant United States attorney in the Eastern District of New York. I also represented the government at trial in this matter. I think the court has anticipated my two responses on these two tenuously related issues. Dealing first with the fingerprint evidence, I think it's important to note just from the outset that the Mayfield case, which, as Your Honor noted, involved different FBI personnel and very different facts, including, and this is the point I want to make, in that particular instance in the Mayfield case, there was a single fingerprint match. And in this instance, the government induced at trial evidence that there were 18 fingerprint matches. That is, fingerprints from FIREC. In the incident case? Yes, Your Honor. On the brown packing tape that was recovered from the unexploded vehicle-borne improvised explosive device that was used to attack Forward Operating Base Chapman. As I think the argument itself illustrated, it takes a substantial amount of time to even explain the facts of the Mayfield case. And in a case like this, where the defendant's conduct spanned continents and more than almost a decade, Judge Kogan correctly ruled that allowing this frolic into a completely unrelated case was going to run the risk of potentially confusing the jury and the complicated facts before it. Now, that said, Judge Kogan was careful to permit defense counsel to pursue the subject matter of the case. And there were substantive lines of cross-examination that I think Mr. Stern has articulated here today. And the theme throughout much of the defense in this case was one of subjectivity. That theme was throughout the cross-examination of the fingerprint evidence and continued through the closing argument. The idea that mistakes could happen was elicited, and the fingerprint expert did not contest that, that there was an element of subjectivity in her process. She explained her process in detail, and she acknowledged that mistakes could happen. There's absolutely no basis to overturn Judge Kogan's ruling that precluded defense counsel from pursuing this totally unrelated constellation of facts, involving different people with a significantly smaller quantity of evidence. Just because Dr. Vedino's testimony was raised, I'd like to address that briefly. And Your Honor, again, anticipated my points, Dr. Vedino's testimony, the vast majority of it, related to questions about the history of Al-Qaeda, the structure of Al-Qaeda's leadership, the location of Al-Qaeda training facilities and the means by which individuals traveled to those facilities. The discussion about whether there was a specific profile for an individual who could radicalize was at the very conclusion of his direct examination. It was really not a core part of what his testimony involved. And also, as Your Honor identified, and just so everyone's clear, there was absolutely no discussion of other terrorists that Dr. Vedino had interviewed, specifically by names or the nature of their conduct.